**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE VOLKSWAGEN "CLEAN
DIESEL" MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION,

JASON HILL et al.,
    *Plaintiffs-Appellees*,

TORI PARTL; MARCIA WEESE;
RUDOLF SODAMIN; GREG R.
SIEWERT and SCOTT SIEWERT;
RONALD CLARK FLESHMAN, JR.;
DEREK R. JOHNSON,
    *Objectors-Appellants*,

v.

VOLKSWAGEN, AG; VOLKSWAGEN
GROUP OF AMERICA, INC.; AUDI,
AG; AUDI OF AMERICA, LLC;
PORSCHE CARS NORTH AMERICA,
INC.; ROBERT BOSCH GMBH;
ROBERT BOSCH, LLC,
    *Defendants-Appellees*,

Nos. 16-17157
16-17158
16-17166
16-17168
16-17183
16-17185

D.C. No.
3:15-md-02672-
CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, Senior District Judge, Presiding

Argued and Submitted December 7, 2017
Pasadena, California

Filed July 9, 2018

Before:  A. Wallace Tashima, William A. Fletcher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Class Action / Settlement

The panel affirmed the district court's judgments certifying a class, approving a settlement, and denying Tori Patl's motion to opt out of the settlement that was entered by Volkswagen and a class of consumers after Volkswagen admitted that it had installed "defeat devices" in certain 2009-2015 model year 2.0-liter diesel cars.

The class settlement set aside ten billion dollars to fund a suite of remedies for class members. The settlement was reached before class certification. The objectors raised a variety of challenges.

The panel held that the district court did not abuse its discretion in certifying the class. The primary objection to the certification concerned whether the interests of "eligible sellers" – class members who owned vehicles with defeat devices when VW's scheme became public, but sold them before the proposed settlement was filed – were adequately represented during settlement negotiations. The panel held that the eligible sellers benefitted from being in the class alongside vehicle owners. The panel further held that there were no signs of an improper conflict of interest that denied absent class members adequate representation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court more than discharged its duty in ensuring that the settlement was fair and adequate to the class, and affirmed the district court's approval of the settlement.  The panel considered the objections to the settlement, and concluded that the district court considered the proper factors, asked the correct questions, and did not abuse its discretion in approving the settlement.  Except with respect to a reversion provision, the appeals did not directly challenge the substantive fairness of the settlement, and therefore the panel held that it had no reason to comment upon it.

Under the terms of the settlement, money not paid out from the settlement pool reverted to Volkswagen, and one objector alleged that this "reversion provision" made it impossible to know the true value of the settlement to the class and provided incentive to Volkswagen to discourage participation in the settlement.  The panel held that the district court adequately explained why the reversion here raised no specter of collusion.  The panel further held that the incentives for class members to participate in the settlement, the complementary inducement for Volkswagen to encourage them to participate, the value of the claims, and the actual trend in class member participation all indicated that the reversion clause did not, in design or in effect, allow VW to recoup a large fraction of the funding pool.

The panel held that the district court did not abuse its discretion in denying Tori Partl's motion to opt out of the class after the deadline to do so had passed.  The panel held that the district court reasonably concluded that Partl had actual notice of the correct procedure to exclude herself from

the class, she seemingly misunderstood clear directions, and such a mistake did not constitute excusable neglect or good cause.

---

## COUNSEL

James Ben Feinman (argued), James B. Feinman & Associates, Lynchburg, Virginia, for Movant-Appellant Ronald Clark Fleshman, Jr.

Sharon Nelles (argued), William B. Monahan, and Robert J. Giuffra Jr., Sullivan & Cromwell LLP, New York, New York, for Defendants-Appellants.

N. Albert Bacharach Jr., N. Albert Bacharach Jr. P.A., Gainesville, Florida, for Objectors-Appellants Greg R. Siewert and Scott Siewert.

Bryan E. Brody, Brody & Cornwell, St. Louis, Missouri, for Objector-Appellant Tori Partl.

Brian Thomas Giles, Giles Lenox, Cincinnati, Ohio, for Objector-Appellant Derek R. Johnson.

Stephen D. Field, Stephen D. Field P.A., Hialeah, Florida, for Objector-Appellant Rudolf Sodamin.

Caroline V. Tucker, Tucker Pollard, Irvine, California, for Objector-Appellant Marcia Weese.

Kevin R. Budner, David S. Stellings, and Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; Benjamin L. Bailey, Bailey Glasser

LLP, Charleston, West Virginia; Roland K. Tellis, Baron & Budd P.C., Encino, California; W. Daniel "Dee" Miles III, Beasley Allen Law Firm, Montgomery, Alabama; Lesley E. Weaver, Bleichmar Fonti & Auld LLP, Oakland, California; David Boies, Boies Schiller & Flexner LLP, Armonk, New York; J. Gerard Stranch IV, Branstetter Stranch & Jennings PLLC, Nashville, Tennessee; James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello P.C., Roseland, New Jersey; David Seabold Casey Jr., Casey Gerry Schenk Francavilla Blatt & Penfield LLP, San Diego, California; Frank Mario Pitre, Cotchett Pitre & McCarthy LLP, Burlingame, California; Rosemary M. Rivas, Levi & Korsinsky LLP, San Francisco, California; Adam J. Levitt, Dicello Levitt & Casey LLP, Chicago, Illinois; Steve W. Berman, Hagens Berman, Seattle, Washington; Michael D. Hausfeld, Hausfeld, Washington, D.C.; Michael Everett Heygood, Heygood Orr & Pearson, Irving, Texas; Lynn Lincoln Sarko, Keller Rohrback LLP, Seattle, Washington; Joseph F. Rice, Motley Rice LLC, Mount Pleasant, South Carolina; Paul J. Geller, Robbins Geller Rudman & Dowd LLP, Boca Raton, Florida; Roxanna Barton Conlin, Roxanne Conlin & Associates P.C., Des Moines, Iowa; Christopher A. Seeger, Seeger Weiss LLP, New York, New York; Jayne Conroy, Simmons Hanly Conroy LLP, New York, New York; Robin L. Greenwald, Weitz & Luxenberg P.C., New York, New York; Samuel Issacharoff, New York, New York; for Plaintiffs-Appellees.

## OPINION

BERZON, Circuit Judge:

*Striving to better, oft we mar what's well.*[1]

Volkswagen duped half a million Americans into buying cars advertised as "clean diesel." They were anything but. As the lawsuits piled up, the car manufacturer hammered out a ten-billion-dollar settlement with a class of consumers, agreeing to fix or buy back the affected vehicles and providing some additional money as well. Following a thorough review, the district court blessed the agreement. Of the half million class members, a handful take issue with the settlement. We consider those appeals.

## BACKGROUND

### I.   Litigation and settlement talks

In September 2015, Volkswagen (or VW) admitted that it had installed "defeat devices" in certain of its 2009–2015 model year 2.0-liter diesel cars. These devices—bits of software in the cars—were at the center of a massive scheme by VW to cheat on U.S. emissions tests. The clever software could detect that a car was undergoing government-mandated testing and activate emissions-control mechanisms. Those mechanisms ensured that the car emitted permissible levels of atmospheric pollutants when the test was in progress. During normal road use, however, the emission-control system was dialed down considerably. As a result, the affected cars

---

[1] William Shakespeare, *King Lear*, act 1, sc. 4.

usually emitted on the road between 10 and 40 times the permissible level of nitrogen oxide, a gas that reacts with other gases to create ozone and smog. This was no small-time con: over 475,000 vehicles in the United States alone contained a defeat device.[2]

The scheme became public when the Environmental Protection Agency (EPA) sent a "Notice of Violation" to Volkswagen alleging that installation of the defeat devices violated the Clean Air Act, 42 U.S.C. § 7522. The notice mentioned the possibility of a civil enforcement action by the Department of Justice.

Vehicle owners were not far behind. Within three months, hundreds of lawsuits against VW, most of them class actions, had been filed in or removed to over sixty federal district courts. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 148 F. Supp. 3d 1367, 1368 (J.P.M.L. Dec. 8, 2015). The complaints alleged a bevy of claims under state and federal law, including—to name just a few—breach of warranty, breach of contract, unjust enrichment, and violation of consumer protection, securities, and racketeering laws.

The Judicial Panel on Multidistrict Litigation transferred all VW defeat device-related cases to Judge Charles Breyer in the Northern District of California ("district court" or "MDL court") for "coordinated or consolidated pretrial proceedings." *Id.* at 1370. In short order the district court appointed Elizabeth Cabraser lead counsel for the putative

---

[2] Because some of the vehicles had several owners, and the class included some former owners of the vehicles, the eventual plaintiff class numbered approximately 490,000.

consumer class actions and chair of the Plaintiffs' Steering Committee (PSC) charged with coordinating pretrial work on behalf of the class. Around the same time, the United States' newly filed enforcement action was transferred into the MDL court.[3]

Settlement talks began early and went quickly. With the aid of a court-appointed settlement master, Robert Mueller, the parties—including the United States and the FTC—had reached agreements in principle by April 2016. Two months later—and just seven months after the cases were consolidated in the MDL court—a trio of proposed settlement agreements were filed by the private plaintiffs' class counsel, the United States, and the FTC.[4]

## II. The settlement agreement

The proposed class settlement set aside ten billion dollars to fund a suite of remedies for class members. A particular class member's choices depended on whether she owned,

---

[3] While settlement talks were underway, a separate FTC enforcement action was also brought into the MDL court. *See FTC v. Volkswagen Grp. of Am., Inc.*, 3:16-cv-01534-CRB (N.D. Cal. March 29, 2016), ECF No. 3.

[4] The consent decree with the United States required VW to (1) buy back or fix 85% of the affected vehicles before June 2019 and (2) pay $4.7 billion to mitigate the effects of the pollution caused by its noncompliant cars and to promote zero-emissions vehicles. The consent order with the FTC largely overlapped with the terms of the class action settlement. For instance, it entered judgment in favor of the FTC in the amount of $10.033 billion, which could be satisfied by establishing a funding pool for the consumer settlement in that amount. The additional relief in the FTC consent order is not relevant to these appeals.

leased, or had previously owned, but sold, a vehicle with a defeat device:

> 1. *Owners*.  Owners had the option to (1) sell the car back to VW at its pre-defeat device value (the "buyback" option) or (2) have the car fixed, provided Volkswagen could develop an EPA-approved emissions modification.[5]  In addition, owners would receive "owner restitution."  For owners who bought their cars before September 18, 2015 ("eligible owners"), that was a cash payment of at least $5,100, but possibly more, depending on the value of the vehicle. Owners who acquired their vehicles after that date ("eligible new owners") would receive half the eligible owner restitution described above—a cash payment of at least $2,550.

> 2.  *Lessees*.   Lessees had the option to (1) terminate their leases without penalty or (2) have the car fixed subject to development of an approved modification.  In addition, lessees would receive "lessee restitution," a

---

[5] Volkswagen was required to have the modifications approved by the California Air Resources Board (CARB).  If VW was unable to develop a government-approved modification by deadlines set out in the settlement agreement, class members would still have time to accept the buyback and would have an additional window of time to opt out of the settlement.  As of July 27, 2017, the EPA and CARB had approved emissions modifications for most of the affected 2.0-liter affected vehicles. *See Volkswagen Clean Air Act Civil Settlement*, U.S. Envtl. Protection Agency, https://www.epa.gov/enforcement/volkswagen-clean-air-act-civil-settlement (last visited June 10, 2018).

cash payment of $1,529 plus 10% of the vehicle's value.

3. *Sellers.* "Eligible sellers"—those who sold their cars after the defeat device scheme became public but before the filing of the settlement with the court in June 2016—would receive "seller restitution" equal to one-half of full owner restitution (a cash payment of at least $2,550, but possibly more, depending on the value of the vehicle).[6]

To receive benefits, a class member submits a claim and supporting documentation; a claims processor verifies the class member's eligibility; and the class member elects a remedy, executes a release, and then obtains the benefit. The last step varies somewhat according to remedy. The deadline for submitting a claim is September 1, 2018.

The settlement figure of $10.033 billion was calculated to cover the most expensive option—the buyback—for all eligible owners, as well as the remedies selected by all non-owner class members. Any money left over in the funding pool will revert to Volkswagen after the claims period runs.[7]

---

[6] The settlement provided other benefits not pertinent to these appeals, such as loan forgiveness for class members who still owed money on their vehicles.

[7] The full amount will likely not be disbursed. Some class members have chosen the less expensive modification remedy; some have opted out of the settlement; and some will not claim the benefits available to them.

### III.    Settlement approval

One month after the proposed settlement was filed with it, the district court granted preliminary approval and ordered extensive notice to the class.  The following schedule was set:

| August 10, 2016 | Additional information regarding class counsel's prospective request for attorneys' fees due. |
|---|---|
| September 16, 2016 | Class members' objections to the settlement and requests for exclusion from it (*i.e.*, opt out) due. |
| October 18, 2016 | Final fairness hearing on the settlement. |

Eighteen class members appeared at the fairness hearing to voice concerns about, or objections to, the settlement.  By that point—just four months after the first proposed settlement was filed and three months after preliminary approval was granted—over 63% of class members had registered for benefits under the settlement.  Of the 490,000 class members, some 3,300 had opted out (although the district court noted a trend of those opt outs reversing course and later claiming benefits), and 462 had timely objected to the settlement.

One week after the fairness hearing, the district court, in a 48-page order, granted final approval of the settlement.  The approval order first found that (1) the class met the threshold requirements to be certified under Rules 23(a) and 23(b)(3), and (2) notice to the class was adequate, *see* Fed. R. Civ. P.

23(c)(2).  Next, it determined that the settlement was "fair, reasonable, and adequate," *see* Fed. R. Civ. P. 23(e)(2), devoting over thirty pages to an analysis of eleven separate factors going to the fairness of the settlement and to the objections of class members.  The district court noted that the overwhelming early participation in the settlement and the very low numbers of opt outs and objections signaled the strength of the settlement.  Assessing factors derived from *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 946–47 (9th Cir. 2011), the district court found that none of the settlement terms evinced collusion or militated against a finding that the settlement was fair, reasonable, and adequate.

In her motion for final approval of the settlement, class counsel stated that she would seek no more than $333 million in attorneys' fees and costs.[8]  The court's order granting final approval directed her to submit a motion for fees by November 8, 2016, and set a deadline for objections to that motion for six weeks after that.

Fourteen appeals from the order approving settlement were consolidated with one related appeal.  Of those, this opinion addresses six.[9]

---

[8] As it turned out, the fee request, granted by the district court, was for $175 million, little more than half the maximum that lead counsel had earlier specified.  Appeals from the district court's orders on attorneys' fees were taken separately and are not addressed in this opinion.

[9] Of the fifteen appeals, five have been voluntarily dismissed.  In separately filed orders, we dismiss another two for lack of standing and a third for failure to prosecute. We address a fourth on the merits in a

## DISCUSSION

"Especially in the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The settlement here was reached before class certification, so *Staton*'s dual direction applies.

The objectors bring a hodgepodge of challenges. One contests the district court's decision to approve certification of the class. Several others dispute the fairness of the settlement itself or the adequacy of the district court's process in approving it. And one appeals the district court's denial of her motion to opt out of the class after the deadline had passed.

The district court's decision to certify a class action and its conclusion that a class action settlement is "fair, reasonable, and adequate" are reviewed for abuse of discretion. *See id.* at 960. So is its denial of a class member's motion to exclude herself from the class out of time. *See Silber v. Mabon*, 18 F.3d 1449, 1453 (9th Cir. 1994). As we explain below, the district court appropriately exercised its considerable discretion in making its determinations. We affirm.

separate memorandum disposition. Of the six appeals we address, two (Nos. 16-17158 and 16-17166) were jointly briefed and present the same issues.

## I.  Certification of the class

We begin by considering whether the class was appropriately certified.  Before certifying a class, a court must ensure that it satisfies the prerequisites of Rule 23, including that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In the settlement context, a court "must pay 'undiluted, even heightened, attention' to class certification requirements."  *Staton*, 327 F.3d at 952 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).

The primary objection before us to the district court's certification decision concerns whether the interests of "eligible sellers"[10] in the class were adequately represented during settlement negotiations.  Distilled down, objector Derek Johnson posits a conflict of interest between the eligible sellers and the vehicle owners—both the eligible owners and the "eligible new owners"[11]—in the class.  As evidence of the conflict, he mainly points to the fact that eligible sellers receive only half the restitution payment accorded to eligible owners: In effect, eligible sellers "split"—figuratively—the amount provided eligible owners with the eligible new owners, who presumably purchased the

---

[10] As described earlier, eligible sellers are class members who owned vehicles with defeat devices on September 18, 2015, when VW's scheme to evade emissions standards became public, but sold them before the proposed settlement was filed on June 28, 2016.

[11] Those are the class members who own an affected Volkswagen but did not purchase it until after the defeat device became public knowledge.

sellers' cars with full knowledge of the vehicle's defect.[12] According to Johnson, this equivalent distribution to eligible new owners and sellers is so unfair to sellers that it demonstrates the sellers were not adequately represented by the named class representatives, only one of whom was a seller.

"The adequacy [of representation] inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Serious conflicts of interest can impair adequate representation by the named plaintiffs, yet leave absent class members bound to the final judgment, thereby violating due process. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)).[13]

---

[12] *See Frequently Asked Questions*, Volkswagen, https://www.vwcourtsettlement.com/en/2-0-models/ (last visited June 10, 2018) ("I sold my car after September 18, 2015. Why is my payment different from eligible owners?" "Class members who have sold their eligible vehicle between September 18, 2015 and June 28, 2016 receive the Seller Restitution because they no longer possess the vehicle to pursue a Buyback or Approved Emissions Modification. Because the Settlements also compensate the current owners of these vehicles, the eligible sellers split the Owner Restitution compensation with the current eligible owner.").

[13] The existence of a conflict does not categorically foreclose class certification. Where a conflict of interest exists within a class, however, additional due process safeguards—such as creating subclasses for groups with disparate interests and appointing separate counsel to represent the interests of each—may be required. *See Amchem*, 521 U.S. at 627; *Hanlon*, 150 F.3d at 1021.

The initial inquiry in assessing adequacy of representation, then, is whether "the named plaintiffs and their counsel have any conflicts of interest with other class members."[14]  *Id.* at 1020.  That general standard must be broken down for specific application; conflicts within classes come in many guises.  For example, two subgroups may have differing, even adversarial, interests in the allocation of limited settlement funds.  *See Amchem*, 521 U.S. at 626. Class members with higher-value claims may have interests in protecting those claims from class members with much weaker ones, *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999), or from being compromised by a class representative with lesser injuries who may settle more valuable claims cheaply, *see Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003), *overruled en banc on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), *rev'd*, 564 U.S. 338 (2011).  Aside from such evident structural conflicts, some proposed agreements are so unfair in their terms to one subset of class members that they cannot but be the product of inadequate representation of that subset. *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995).

Perusing the settlement before us, we see no indication of an "irreparable conflict of interest," either in the structure of the class or the terms of the settlement, that prevented the named class representatives from adequately representing sellers, or prohibited the commingling of the two in a single class.  *Hanlon*, 150 F.3d at 1021.

---

[14] Adequacy "also factors in competency and conflicts of class counsel." *Amchem*, 521 U.S. at 626 n.20; *see also Hanlon*, 150 F.3d at 1021.  The objection here raises no questions about that aspect of adequacy of representation.

Far from getting the short end of the stick, the eligible sellers gained enormously from being in the class with vehicle owners. The eligible owners—who comprise the vast majority of the class—were the ones with leverage enough to obtain benefits for the class. First, they had individually valuable and near-ironclad claims for rescission or restitution against VW. Second, the DOJ consent decree required VW to fix or buy back a large percentage—85%—of the affected vehicles. Failure to do so would result in immense fines. That Volkswagen thus needed to reach a deal with vehicle owners—a group including both eligible owners and eligible *new* owners—gave the class as a whole enormous collective power in bargaining.

By contrast, the eligible sellers' claims, viewed in isolation, were fairly weak. The eligible sellers no longer had the cars whose purchase allegedly caused them injury; their theory would have been that they sold their defective cars at a loss attributable to VW's installation of the defeat device (and the subsequent public revelation). But it would be difficult to prove why any eligible seller chose to sell his car or the degree to which, if any, the sale price reflected a discount for the defeat device. As one class member conceded at the fairness hearing, "[n]o one forced eligible sellers to sell their vehicles." Given the speed with which the putative classes were consolidated and settlement talks began, it is likely that many eligible sellers knew of the lawsuit, and some of the looming settlement, when they sold. The cars, moreover, were still functional and safe to drive, and the federal government made it clear from the beginning that it would not punish those driving cars with defeat devices—all of which puts a question mark over how much value the

vehicles lost as a result of the scandal.[15]  So eligible sellers would face challenging, if not insurmountable, questions of causation and damages if they litigated their cases against VW.

Instead of getting nothing, eligible sellers received several thousand dollars in compensation.  They quite possibly obtained it *because* they were in the same class as vehicle owners who had leverage against Volkswagen, not in spite of that inclusion.  The patent upside of the settlement to eligible sellers defeats Johnson's central argument that the settlement was so unfair to sellers that it could only have been the result of inadequate representation.  In that respect, this case bears no resemblance to ones in which the settlement terms are so skewed that it may be confidently inferred that some class members were not adequately represented.  *See Amchem*, 521 U.S. at 627; *Molski*, 318 F.3d at 956; *In re GMC*, 55 F.3d at 801.

Further, even if the eligible sellers' claims were viable, the seller restitution, if evaluated as covering the economic losses incurred, was in an amount that generally fairly compensated for such losses.  Class counsel explained at the fairness hearing that the restitution figure "in most instances"

---

[15] In a press release, the EPA told drivers: "Car owners should know that although these vehicles have emissions exceeding standards, these violations do not present a safety hazard and the cars remain legal to drive and resell."  The EPA website advises that "EPA will not confiscate your vehicle or require you to stop driving."  *Frequent Questions About Volkswagen Violations*, U.S. Envtl. Protection Agency, https://www.epa.gov/vw/frequent-questions-about-volkswagen-violations (last visited June 12, 2018).  Most state attorneys general have also publicly disclaimed any intent to punish drivers of defeat device-equipped vehicles.

accounted for the loss realized by eligible sellers when they sold their vehicles.  That Johnson and some others were not made whole by it does not render the benefit amount unreasonable,[16] much less demonstrate that it was necessarily the product of inadequate representation of the sellers.  *See Molski*, 318 F.3d at 955 (representation held inadequate because "the consent decree released almost all of the absent class members' claims with little or no compensation").

Moreover, the restitution payments overall more closely resemble compensatory damages awards or penalty payments, as they are for most class members an amount of money over and above the economic value of any fix or buyback.  It was therefore sensible that Volkswagen should be required to pay that "bonus" amount only once per car.  The fact that eligible sellers "split" the restitution payment with eligible new owners is thus fully explicable, and does not alter our analysis, demonstrate unfairness to eligible sellers, or otherwise reveal an intra-class conflict.

In sum, the eligible sellers benefitted from being in the class alongside vehicle owners.  We see no signs of an "improper conflict of interest . . . which would deny absent class members adequate representation."  *Hanlon*, 150 F.3d

---

[16] Any settlement value based on averages will undercompensate some and overcompensate others.  *See* Robert G. Bone, *Agreeing to Fair Process: The Problem with Contractarian Theories of Procedural Fairness*, 83 B.U. L. Rev. 485, 552 (2003) ("[W]ealth transfers are endemic to damage class actions that settle for average amounts . . . ."); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999).

at 1021.  There was no abuse of discretion in certifying the class.[17]

## II.  The settlement

We turn now to the settlement itself.  Judicial review of class settlements is replete with contrasts.  The district court must undertake a stringent review, "explor[ing] comprehensively all factors, and . . . giv[ing] a reasoned response to all non-frivolous objections," *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation and quotation marks omitted), whereas our own review of the district court's reasoning is "extremely limited"; we reverse "only upon a strong showing that the district court's decision was a clear abuse of discretion." *Hanlon*, 150 F.3d at 1026, 1027 (citation and quotation marks omitted).  In another dichotomy, "we hold district courts to a high[] *procedural* standard" in their review of a settlement, *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015), but we "rarely overturn an approval of a class action consent decree on appellate review for *substantive* reasons." *Staton*, 327 F.3d at 960 (emphasis added).  Our decision here reflects the interplay of these standards.

This settlement is highly unusual.  Most class members' compensation—buybacks, fixes, or lease terminations *plus* some cash—is as much as, perhaps more than, they could

---

[17] This conclusion is not affected by this court's recent decision in *In re Hyundai & Kia Fuel Economy Litigation*, 881 F.3d 679 (9th Cir. 2018), *petition for reh'g en banc filed*, No. 15-56014 (9th Cir. Mar. 8, 2018). Unlike in that case, the district court here provided a thorough predominance analysis under Rule 23(b)(3), sufficient under *In re Hyundai*. *Cf. id.* at 702.

expect to receive in a successful suit litigated to judgment. And not just some of them: the $10.033 billion set aside would fund the most expensive remedy option for every single class member.    Class members did not loiter in claiming these benefits.    By the time these appeals were briefed, Volkswagen had paid out or committed to pay over $7 billion.    And according to the last report from the court-appointed independent claims supervisor, by May 2018 Volkswagen had fixed or removed from the road 85.8% of all affected vehicles; paid out $7.4 billion to over 350,000 class members; and paid out or committed $8.1 billion to almost 450,000 class members.    Terming the settlement a "compromise" of claims, although true of most class action settlements, is largely inapt here.    The district court so noted, stating that the class members generally "are made whole" by the settlement.

Not surprisingly given the scope of the remedies afforded, most of the objections to the settlement are in some sense procedural: the district court did not sufficiently examine the settlement for signs of collusion between the defendants and class counsel; or misinterpreted what signs of collusion there were; or failed to respond specifically to an objection; or did not give class members a real shot to respond to class counsel's fee motion.    In considering these objections, we keep in mind that the fundamental issue before the district court was whether the proposed settlement is "fair, reasonable, and adequate."    Fed. R. Civ. P. 23(e)(2).

## A.   Review of class settlements

A proposed settlement that is "fair, adequate and free from collusion" will pass judicial muster.    *Hanlon*, 150 F.3d at 1027.    The inquiry is not a casual one; the uncommon risks

posed by class action settlements demand serious review by the district court. An entire jurisprudence has grown up around the need to protect class members—who often lack the ability, positioning, or incentive to monitor negotiations between class counsel and settling defendants—from the danger of a collusive settlement. *See, e.g.*, *Staton*, 327 F.3d at 959–60; *In re Bluetooth*, 654 F.3d at 946–47; *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). Because of "the inherent tensions among class representation, defendant's interests in minimizing the cost of the total settlement package, and class counsel's interest in fees," *Staton*, 327 F.3d at 972 n.22, we impose upon district courts "a fiduciary duty to look after the interests of . . . absent class members," *Allen*, 787 F.3d at 1223.

At the same time, there are few, if any, hard-and-fast rules about what makes a settlement "fair" or "reasonable." We have identified a lengthy but non-exhaustive list of factors that a district court may consider when weighing a proposed settlement.[18] When, as here, the settlement was negotiated before the district court certified the class, "there is an even greater potential for a breach of fiduciary duty" by class counsel, so we require the district court to undertake an additional search for "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of

---

[18] These factors include "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026; *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

certain class members to infect the negotiations."  *In re Bluetooth*, 654 F.3d at 946–47.[19]

For all these factors, considerations, "subtle signs," and red flags, however, the underlying question remains this: Is the settlement fair?  The factors and warning signs identified in *Hanlon*, *Staton*, *In re Bluetooth*, and other cases are useful, but in the end are just guideposts.  "The relative degree of importance to be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case."  *Officers for Justice*, 688 F.2d at 625. Deciding whether a settlement is fair is ultimately "an amalgam of delicate balancing, gross approximations and rough justice," *id.* (citation omitted), best left to the district judge, who has or can develop a firsthand grasp of the claims, the class, the evidence, and the course of the proceedings—the whole gestalt of the case.  Accordingly, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge."  *Hanlon*, 150 F.3d at 1026.  "As a practical matter we will rarely overturn an approval of a class action consent decree on appellate review for substantive reasons unless the terms of the agreement contain convincing indications that the incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of the negotiations and that the district court was wrong in concluding otherwise."  *Staton*, 327 F.3d at 960.

---

[19] A few such "warning signs" are attorneys' fees out of proportion to class member compensation, "clear sailing" arrangements, and agreements in which unawarded attorneys' fees revert to the defendants.  *See In re Bluetooth*, 654 F.3d at 947.  A "clear sailing" arrangement is one in which defendants agree not to object to class counsel's prospective motion for attorneys' fees provided the request does not exceed a certain amount.  *See Allen*, 787 F.3d at 1224.

With these principles in mind, we turn to the objections.

### B. The district court's examination of signs of possible collusion

The sole substantive objection before us to the terms of the settlement centers on its so-called "reversion clause." Under the settlement, money not paid out from the $10.033 billion settlement pool will revert to Volkswagen. According to one objector, the potential for reversion makes it impossible to know the true value of the settlement to the class, and creates perverse incentives for Volkswagen to discourage participation in the settlement.

A "kicker" or reversion clause directs unclaimed portions of a settlement fund, or in some cases money set aside for attorneys' fees but not awarded by the court, to be paid back to the defendant. *See In re Bluetooth*, 654 F.3d at 947; *Mirfasihi*, 356 F.3d at 783. A reversion can benefit both defendants and class counsel, and thus raise the specter of their collusion, by (1) reducing the actual amount defendants are on the hook for, especially if the individual claims are relatively low-value, or the cost of claiming benefits relatively high; and (2) giving counsel an inflated common-fund value against which to base a fee motion.[20]  *See Allen*,

---

[20] *See also Mirfasihi*, 356 F.3d at 783 ("The part of the $2.4 million that is not claimed will revert to Fleet, and it is likely to be a large part because many people won't bother to do the paperwork necessary to obtain $10 . . . .").

Some commentators and courts disfavor reversions because they arguably undermine the deterrent effect of class actions. *See* 4 William B. Rubenstein, *Newberg on Class Actions* § 12:29 & n.5 (5th ed. 2014). That is not the basis of the objection here—as it hardly could be, with VW on

787 F.3d at 1224 & n.4. Given these possibilities, a reversion clause can be a tipoff that "class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947.

But reversion clauses can also have perfectly benign purposes and impacts, and so are not per se forbidden. Rather, to exercise its discretion appropriately, a district court must explain why the reversionary component of a settlement negotiated before certification is consistent with proper dealing by class counsel and defendants. *See id.* at 950.

The district court adequately explained why the reversion here raises no specter of collusion. First, as the district court noted, Volkswagen has every incentive to "to buy back or fix as many Eligible Vehicles as possible." Under the terms of the DOJ consent decree, if Volkswagen fails to fix or remove from the road 85% of the affected vehicles, it will be fined $85 million for each percentage point it comes up short. Second, from a class member's perspective, the benefits available are quite substantial, worth at least thousands of dollars, and in some cases more, to each class member. Given the amounts at stake, there is little chance class members will forego the benefits because of the effort of lodging a claim. Indeed, we needn't speculate as to participation. As of the date of the fairness hearing, 336,000 class members (of 490,000 total) had already registered to claim settlement benefits, and the numbers have only grown.

The incentives for class members to participate in the settlement, the complementary inducement for Volkswagen

the hook for billions of dollars by the time of the approval hearing on the settlement.

to encourage them to participate, the value of the claims, and the actual trend in class member participation all indicate that the reversion clause did not, in design or in effect, allow VW to recoup a large fraction of the funding pool.[21]

The district court did not abuse its discretion in determining that the reversion clause was a reasonable provision in this settlement, given the incentives to the class to claim quite substantial benefits, and was in no way a sign of collusion or unfairness. *See Allen*, 787 F.3d at 1225.[22]

### C. *The district court's obligation to respond to every objection*

One objector finds fault in the district court's failure to respond specifically to her objection to the settlement.

"To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864 (citations and quotation marks omitted). That "procedural burden" on the district court helps to ensure the

---

[21] As noted in the district court's order, the $10.033 billion figure was arrived at by estimating the cost of the most expensive remedy—the buyback—for all owners in the class. Money would be left over in the funding pool if, as happened, some class members chose the less-expensive engine modification remedy and others opted out.

[22] The same objector argues that the district court abused its discretion by failing to examine the settlement for the signs of collusion laid out in *In re Bluetooth*, 654 F.3d at 947. To the contrary, the district court explicitly discussed those factors over several pages in its order. We find no error in its analysis.

substantive fairness of the settlement.  *See Allen*, 787 F.3d at 1223.

Class member Marcia Weese objected to the settlement on two grounds relevant here.  First, she maintained that different claims-processing procedures for class members with liens on their vehicles meant that Rule 23's "predominance requirement" was not met.[23]  Second, and relatedly, she contended that the long-form notice to the class did not adequately explain the effects of a class member's vehicle lien on her eligibility for settlement benefits.  The district court did not respond to either argument in its order.

As a threshold matter, even assuming Weese's arguments were "non-frivolous," *Dennis*, 697 F.3d at 864, we would be reluctant in the extreme, on the procedural ground raised, to upset a settlement—especially one of such overall benefit to the class—that otherwise evinced no signs of collusion, unfairness, or irregularity.  *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378–79 (9th Cir. 1993).  That is all the more true here because the objector's complaint appears to be purely technical—it draws no link between the district court's supposed oversight and any substantive deficiency in the settlement.  By so noting, we are not suggesting a harmless error standard for class action settlement review or otherwise disparaging the importance of procedural rigor in the review of such settlements.  We merely emphasize that a reviewing court is concerned with the overall adequacy of the district

---

[23] Class actions certified under Rule 23(b)(3), such as this one, may be maintained only if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

court's fairness determination, not with parliamentary points of order about its process.

In any event, Weese's objections *were* frivolous, and so did not demand a response from the district court. In three sentences, she argues that additional claims-processing steps for class members with liens create individualized questions of law or fact that defeat predominance under Rule 23. But that objection is faulty on its face. The settlement does not "den[y] recovery" to, or exclude from class membership, vehicle owners with liens or loans. It just provides that, because of technical issues raised by the loan or lien as to the vehicle's title, those individuals—who still have the same legal claims, based on the same questions of law and fact, as other class members—must take additional steps to claim their benefits under the settlement. The district court properly concluded that class members—including those with liens—asserted the same injury and invoked the same basic legal theories against Volkswagen, thereby satisfying Rule 23(b)(3).

Again contrary to Weese's objection, the long-form notice to class members makes eminently clear how outstanding loans impact a class member's compensation. As the notice explains, the settlement provides *additional* compensation to class members with outstanding loans, over and above buyback value, to help them clean up title and deliver their vehicles to Volkswagen. The challenge to the notice was thus frivolous.[24]

---

[24] The long-form notice discusses outstanding "loans," rather than "liens" on the vehicles, but we do not think the distinction significant. A class member reading the notice would understand that she could participate in the buyback even if she did not own her vehicle outright.

Because Weese's arguments entirely lacked merit, the district court was not obligated to respond.  *See Dennis*, 697 F.3d at 864.

### D.  *The notice and timing of class counsel's motion for fees*

Objections were raised with regard to both the timing and notice of class counsel's fee application.

Challenges to the notice and timing of fees under Rule 23(h) are typically framed and analyzed as challenges to the fee award, not the settlement.  *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010); *Allen*, 787 F.3d at 1225; *Keil v. Lopez*, 862 F.3d 685, 703 (8th Cir. 2017).   Here, the district court's fee orders have been separately appealed.[25]  By pressing fee-related arguments in these appeals, we understand appellants to be arguing that the district court's scheduling and notice with regard to fee objections under Rule 23(h) rendered the substantive settlement, not the fee award, unfair.  *See* Fed. R. Civ. P. 23(e)(2); *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 444 (3d Cir. 2016) (considering whether fee-scheduling issues merited reversal of the order approving settlement, even though fees would be separately ruled upon and appealed).  In rejecting these Rule 23(h) arguments in this appeal, we express no opinion as to the reasonableness or procedural propriety of the district court's fee award.

---

[25] One of the two objectors challenging fees in these appeals has also separately appealed the district court's order awarding fees to class counsel.

### i.  The timing of objections to class counsel's fee motion

Several objectors contend that the district court misapplied Rule 23 by setting the deadline for class members to object to the settlement before the date by which class counsel had to file a motion for fees.  We disagree.

A court may award reasonable attorneys' fees in a certified class action. Fed. R. Civ. P. 23(h).  Class counsel seeking a fee award must make a motion for fees under Rule 54, and notice of the motion must be "directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h)(1); *see also* Fed. R. Civ. P. 54(d)(2) (laying out the requirements for an attorney's motion for fees).  Any class member "may object to the motion."  Fed. R. Civ. P. 23(h)(2).

Rule 23(h) is silent as to the timing of fee motions, but the requirement that a class member be able to object by necessity imposes one.  After all, a class member can't object to a nonexistent motion for fees.  "The plain text of [Rule 23] requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed."  *In re Mercury*, 618 F.3d at 993 (emphasis omitted).

In *In re Mercury*, class members received notice describing the terms of the settlement and informing them that class counsel would seek 25% of the nine-figure settlement sum—almost $30 million—in fees.  *Id.* at 991.  The district court set a deadline for class members to object to the settlement and the "application" for attorneys' fees.  *Id.* But class counsel's actual fee application was not filed until two weeks *after* that deadline.  *Id.* at 990–91.  We concluded

that Rule 23(h) plainly requires that class members have a chance "to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed," even if counsel specifies in its preliminary notice to the class the amount in fees it will later request. *Id.* at 993–94. Setting a schedule that denies class members a chance to object meaningfully to a fee motion by class counsel "borders on a denial of due process," *id.* at 993, and represents a failure by the district court "to fulfill its fiduciary responsibilities to the class," *id.* at 994–95; *see also Allen*, 787 F.3d at 1225–26; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954 (9th Cir. 2015) (explaining that *In re Mercury* "rejected as insufficient Rule 23(h) notice when the motion for attorneys' fees was due after the deadline for class members to object to *the attorneys' fees motion*" (emphasis added)).

But Rule 23(h) does not require that class counsel's fee motion be filed before the deadline for class members to object to, or opt out of, the substantive *settlement*. Rather, the rule demands that class members be able to "object to *the motion*"—that is, the motion that class counsel must file to make a claim for fees under Rule 23. Fed. R. Civ. P. 23(h)(1)–(2) (emphasis added). An entirely separate provision of Rule 23 provides for class members' objections to the terms of a proposed settlement. *See* Fed. R. Civ. P. 23(e)(5). If Rule 23(h)(2) required that class members be able to object to the settlement as a whole only after class counsel's fee motion had been filed, it would say so.[26]

---

[26] The Third Circuit—the only circuit that has squarely decided the issue—agrees that deferring consideration of class counsel's fees until after a settlement is approved—and, consequently, until after objections to the settlement are heard and ruled upon—is no affront to Rule 23. *See In re NFL*, 821 F.3d at 445–46 (holding that "the separation of a fee award

In sum, approving a settlement before class counsel has filed a fee motion does not violate Rule 23(h).  What matters is that class members have a chance to object to the fee motion when it is filed.[27]

Here, the district court gave class members six weeks to object to class counsel's completed fee motion, and several of them did so.[28]  That period of time was more than enough for class members to "object to the motion."  Fed. R. Civ. P. 23(h)(2).  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954 (fifteen-day period to object to class

---

from final approval of the settlement does not violate Rule 23(h)"); *id.* at 445 (observing that "the practice of deferring consideration of a fee award is not so irregular" and collecting cases).

[27] We appreciate that the Advisory Committee Notes to Rule 23 encourage the simultaneous filing of notice of the terms of a proposed settlement and of class counsel's fee motion.  *See* Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment ("In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement . . . .").  A fee motion in some circumstances can "play[] an important role in class members' capacity to evaluate the fairness of the settlement itself."  4 Rubenstein, *supra*, § 8:22.  But we cannot say that separating consideration of the settlement from consideration of class counsel's fees violates Rule 23(h).  We leave for another day, and a more dubious settlement, the question of whether the inability of class members to object to a settlement after seeing a completed fee motion from class counsel could render the whole settlement unfair or unreasonable.

[28] To boot, the class had reason to know as early as August 10, 2016—more than a month before the deadline to opt out—that class counsel would seek no more than $333 million in attorneys' fees and costs. *See supra* note 8.  Providing a dollar amount to class members does not by itself satisfy Rule 23(h), *see In re Mercury*, 618 F.3d at 994, but here it gave class members a ballpark estimate early on, in addition to the more-than-adequate six weeks they had to respond to the fee motion itself.

counsel's fee motion satisfied Rule 23).    Because the scheduling orders did not violate Rule 23(h), they provide no basis for upsetting the settlement.

### ii.  Notice of class counsel's fee motion

Relatedly, two objectors argue that the district court erred by not ensuring that notice of class counsel's fee motion was "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).  Because the fee motion was only posted on the settlement website, the argument goes, rather than individually mailed or emailed to class members, the notice was unreasonable and inadequate under Rule 23(h).  For their part, plaintiffs-appellees respond that together, the long-form settlement notice and the district court's order granting final approval sufficiently advised class members to look for a prospective fee motion posted online.

We do not reach this objection.  No matter how construed, it is a challenge to the fee award, not to the district court's order approving the settlement.    Unlike the Rule 23(h) argument regarding the scheduling of class counsel's fee motion, the objectors draw no link between the notice of class counsel's fee motion—which occurred *after* the settlement was approved—and whether the *settlement* is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  If meritorious, objectors' notice argument goes to whether the district court's order awarding fees to class counsel may stand.  For all we know, this court will later address this objection in the fee award appeals.  But as briefed here, the objection does not point to any possible defect in the settlement order.    We therefore do not pass upon the objection.

## E.  Remaining objections

The last objector, Ronald Clark Fleshman, Jr., asks that we overturn the district court's approval of the settlement because it unfairly exposes some class members to future liability under the Clean Air Act, and because it assertedly permits the ongoing unlawful use of unmodified Volkswagens.

We discussed these same arguments at length in our opinion affirming the district court's denial of Fleshman's attempted intervention in the United States' enforcement action. *See In re VW "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, No. 16-17060 (9th Cir. July 3, 2018). In a nutshell, Fleshman contended there, and maintains here, that under a proper reading of the Clean Air Act and its state-level implementations, it is unlawful to drive or resell an unmodified Volkswagen with a defeat device.  Because the settlement allows class members to wait for an approved emissions modification—and drive their vehicles in the meantime—and because class members can decline to participate in the settlement and continue to drive their unmodified vehicles as long as they wish, the settlement permits ongoing illegal conduct.  That conduct could, Fleshman maintains, expose hundreds of thousands of class members to criminal or civil liability, as well as to the possibility that their vehicles will be confiscated.  At that point, Fleshman represents, the class members' claims against Volkswagen will have been released by the settlement agreement.  That concatenation of risks, and the settlement notice's failure to advise class members of them, says Fleshman, renders the settlement unfair and unreasonable.

That argument did not persuade us in Fleshman's last appeal, and it does not persuade us here. Leaving to one side whether his interpretation of the Clean Air Act is correct, his central premise—that class members may be subjected to a civil or criminal sanction for driving unmodified Volkswagens—is wholly speculative. As the district court noted, the EPA and the vast majority of states have stated unequivocally that they will permit unmodified vehicles to stay on the road, and none has specifically declared them illegal to drive. Because the risks and dangers Fleshman warns about were completely improbable at the time of settlement (and remain so), the settlement notice need not have advertised them to class members, nor need the settlement have protected against them. The district court did not abuse its discretion in finding the settlement fair and reasonable over Fleshman's objections.[29]

*    *    *    *

Again, the district court's task in reviewing a settlement is to make sure it is "not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. Our thorough consideration of the objections before us does not betoken any doubts on our part that the district court considered the proper factors, asked the correct questions, and did not abuse its discretion in approving this settlement. Except as noted—with respect to the reversion provision—these appeals did not directly challenge the

---

[29] Likewise, Fleshman's predictions that Volkswagen would not be able to develop an EPA-approved modification, or to buy back or fix at least 85% of the vehicles, have proven wrong.

substantive fairness of the settlement, and we therefore had no reason to comment upon it directly other than as to that provision. We do note that the settlement delivered tangible, substantial benefits to class members, seemingly the equivalent of—or superior to—those obtainable after successful litigation, and was arrived at after a momentous effort by the parties, the settlement master, and the district court. The district court more than discharged its duty in ensuring that the settlement was fair and adequate to the class. We affirm its order approving the settlement.

## III.  Belated opt-out

In her related appeal, Tori Partl challenges the district court's denial of her motion to opt out of the settlement class after the deadline to do so had passed. Discerning no abuse of discretion, we affirm.

### A. Facts

Partl sued Volkswagen in 2013 for problems related to water leaks and "abnormal noises" in her vehicle. On August 7, 2016, Partl received an email regarding the class action settlement. The email included a link to the settlement webpage. Partl forwarded the email, along with the 32-page long-form settlement notice available at the settlement website, to her attorney. The relevant portions of the settlement notice read:

> **2. How do I claim Class Action Settlement benefits?**
>
> To claim Class Action Settlement benefits, you will need to make a claim online at

www.VWCourtSettlement.com, or by mail or fax, as the Claims Supervisor provides.

. . .

**50.  How do I get out of the Class Action Settlement?**

If you do not want to receive benefits from the Class Action Settlement, and you want to retain the right to sue Volkswagen about the legal issues in this case, then you must take steps to remove yourself from the Class Action Settlement.  You may do this by asking to be excluded—sometimes referred to as "opting out" of—the Class Action Settlement.  To do so, *you must mail a letter or other written document* to the Court-Appointed claims supervisor.

. . .

You must *mail* your exclusion request, *postmarked* no later than September 16, 2016, to Opt Out VW Settlement, P.O. Box 57424, Washington, DC 20037 (emphasis added).

Partl and her lawyer spoke by phone later that day and agreed that Partl would opt out of the settlement.  After their conversation, Partl returned to the settlement website and completed what she believed were all the steps needed to opt out of the settlement.

The deadline to opt out—September 16, 2016—came and went.  On September 30, Partl learned at a mediation session in her state-court action that she had missed the deadline. Following that discovery, her lawyer undertook the necessary steps to be admitted pro hac vice in the MDL court so he could attempt to remedy the situation.  Finally, on October 17, 2016—one month after the deadline had passed—Partl filed her belated motion to opt out of the settlement.

The district court denied her motion, noting that the long-form settlement notice "clearly provide[d]" that to opt out, class members had to *mail* in their notices of exclusion by September 16, 2016.  The court held that Partl had actual notice of the correct procedure to exclude herself from the class.  She seemingly misunderstood clear directions.  Such a mistake does not constitute excusable neglect or good cause.

## B.  Discussion

A court may, in cases of "excusable neglect," extend the time in which a class member may opt out of a settlement. *See* Fed. R. Civ. P. 6(b), 60(b)(1); *Silber*, 18 F.3d at 1455.  In the context of a tardy opt-out from a class action settlement, we have specifically identified as the relevant "excusable neglect" factors "the degree of compliance with the best practicable notice procedures; when notice was actually received and if not timely received, why not; what caused the delay, and whose responsibility was it; how quickly the belated opt-out request was made once notice was received; how many class members want to opt out; and whether allowing a belated opt out would affect either the settlement or finality of the judgment."  *Id.*; *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395

(1993) (stating the factors for determining "excusable neglect" generally). "The scope of appellate review of the district court's disallowance of a late claim is narrow. . . . [W]e are not to substitute our ideas of fairness for those of the district judge in the absence of evidence that he acted arbitrarily, and such evidence must constitute a 'clear showing' of abuse of discretion." *Silber*, 18 F.3d at 1455 (internal quotation marks omitted) (quoting *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1128 (9th Cir. 1977)).

The district court did not abuse its discretion in refusing to grant Partl's opt-out request. Properly identifying *Silber* as governing the excusable neglect inquiry in this context, the court zeroed in on the two *Silber* factors most relevant here: whether Partl received notice, and who was responsible for the delay. *See id.* Weighing them, the court concluded Partl's neglect was not excusable because (1) she had actual and timely notice of the proper method of excluding herself from the settlement; and (2) she was therefore herself squarely responsible for the failure to opt out on time. That conclusion is reasonable, supported by the record, and grounded in the relevant legal standard. *Cf. Kyle v. Campbell Soup Co.*, 28 F.3d 928, 932 (9th Cir. 1994) (attorney's two-day-late filing caused by a mistake in interpreting the court's "nonambiguous" local rules was not excusable neglect). Under the "narrow" review appropriate here, there was no abuse of discretion in denying Partl's motion to opt out late. *See id.*; *In re Gypsum Antitrust Cases*, 565 F.2d at 1128.

## CONCLUSION

The district court did not abuse its discretion in certifying the class, approving the settlement, or denying Tori Partl's

motion to opt out of the settlement.  Its judgments are **AFFIRMED.**